[Civ. No. 18913. Fourth Dist., Div. One. May 28, 1980.]

COLDWELL BANKER & COMPANY, Plaintiff and Appellant, v. PEPPER TREE OFFICE CENTER ASSOCIATES et al., Defendants and Respondents.

274

COUNSEL

Shelly Jay Shafron for Plaintiff and Appellant.

Marinos, Styn & Studebaker and James S. Marinos for Defendants and Respondents.

OPINION

GREER, J.*—Plaintiff Coldwell Banker & Company (Coldwell) appeals a portion of a judgment in favor of defendants Pepper Tree Office Center Associates (Pepper Tree) and its general partner Michael Bonaguidi (Bonaguidi). The judgment denied commissions to Coldwell for three leases between Pepper Tree and (1) United Palomar, (2) First Fidelity, and (3) U.S. Data Systems, all three of which are called the "Palomar Group" (Palomar).

There is one central issue: whether the record supports the trial court's finding that an exclusive agency agreement between Bonaguidi and real estate broker Coldwell for leasing office space in the then yet-to-be-built Pepper Tree Office Building in Mission Valley was orally modified by the parties, with the modification partially acknowledged in a letter of April 11, 1977, from Coldwell to Bonaguidi.

The record substantially supports the findings of the trial court. Plaintiff Coldwell did not procure the three leases of the Palomar group and is not due commissions on them and the broker's agreement between the parties was orally modified. Because the modification was fully executed and supported by consideration, it is enforceable under Civil Code section 1698, as amended.

FACTS

The exclusive agency agreement signed July 20, 1976, between Coldwell and Bonaguidi of the Pepper Tree Office Building was an edited version of the standard Coldwell agreement. It provided, in part, a commission was due to Coldwell (1) if Coldwell "procures" a tenant during

---

*Assigned by the Chairperson of the Judicial Council.

the agreement's life, or (2) if the property is leased through the efforts of anyone other than the owner.

Several letters from Coldwell to Bonaguidi were admitted into evidence, but a key communication is the April 11 "modification" letter.[1]

The letter does not specifically mention the broker's commission and trial testimony is conflicting; R. Kendal Jones of Coldwell testifying that Bonaguidi orally said the commission would be paid and Bonaguidi specifically denying this.

In findings of fact numbers 9 and 10,[2] the trial court determined Coldwell agreed with Bonaguidi not to negotiate further with prospects

---

[1]The April 11 "modification" letter reads:

"Dear Mike:

"Pursuant to our phone conversation this afternoon I am doing the following:

"(1) Preparing a lease for Manhattan Life Insurance Company to occupy approximately 675 square feet as per their proposal dated March 24, 1977.

"(2) Preparing a letter of agreement to terminate the lease between you and Property Research Investment Firm dated November 20, 1976. It is my understanding that your position regarding the commission on this particular lease is that the commission has been earned and is considered payable by you. I will also accompany the letter of termination with a bill for this particular lease.

"(3) Palomar Financial. It is my understanding that you prefer Coldwell Banker Commercial Brokerage Company to not become actively involved at the present time in this lease negotiation. Once you determine that the negotiations are to the point where you would like Coldwell Banker Commercial Brokerage Company to become actively involved in negotiation, we will do so at that point.

"(4) Bankers Life of Iowa. It is my understanding that you are going to reconsider this tenant and your proposal to them, due to the fact that their lease does not expire until May of 1980. I will look forward to your response on this matter so that I might advise Mr. Bill Perry, General Agent of Bankers Life of Iowa, as to the posture we are now taking.

"I should have a lease from LIS Corporation sometime Tuesday or Wednesday to deliver to you for your execution. I'll look forward to talking to you then.

"Sincerely,

"COLDWELL BANKER
COMMERCIAL BROKERAGE COMPANY"

This ambiguous letter cannot be considered as a written modification under Civil Code section 1698, subdivision (a), an uncertain contract is unenforceable. (Civ. Code, §§ 1649, 1654, 3390, subd. 5; Rest., Contracts, § 370.)

[2]"9. In early April 1977, plaintiff was informed by defendants and Grubb and Ellis that plaintiff was not to negotiate further with other prospects for the subject office space because defendants were unhappy and disenchanted with the efforts of plaintiff. [¶] 10. This was confirmed in a letter dated April 11, 1977, from Jones to Bonaguidi, exhibit 7 in evidence, which was an acknowledgment of the modification and revision of the previous relations between plaintiff and defendants."

other than the license information service, with the parties agreeing at trial that the license lease commission was due.

Bonaguidi developed the Palomar lease proposals and submitted them to Jim Beaver of the Palomar group through their broker, Grubb & Ellis. The initial contact, however, with the Palomar group was made by Bonaguidi who personally contacted Beaver. Bonaguidi testified that Grubb & Ellis did not perform the usual services of a broker on the Palomar leases, but acted as a "buffer" between him and the tenants.

The trial court concluded Coldwell did not "procure" the three Palomar leases. Testimony demonstrated Coldwell sent a brochure advertising the Pepper Tree Office Building to Grubb & Ellis, Palomar's agent, but otherwise did little more.

Two commission payments totalling $3,500 were paid by Bonaguidi to Coldwell, but the record is silent as to how those payments were to be allocated among Coldwell's tenant prospects.

### THERE WAS SUBSTANTIAL EVIDENCE TO SUPPORT THE FINDINGS OF THE TRIAL COURT

■ When a finding of the trial court is attacked as being unsupported by the evidence, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding. The reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact (*Williamson & Vollmer Engineering, Inc.* v. *Sequoia Ins. Co.* (1976) 64 Cal.App.3d 261, 266-267 [134 Cal.Rptr. 427]). The appellate court will look to the evidence supporting the successful party and disregard contrary showing, and when two or more inferences can reasonably be deduced from the facts, the appellate court is without power to substitute its deductions for those of the trial court (*Aetna Casualty & Surety Co.* v. *Richmond* (1977) 76 Cal.App.3d 645, 651 [143 Cal.Rptr. 75]).

The testimony of a single witness, even of a party, is adequate to support the trial court's findings (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479]).

"'All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient

verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed.'" (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 249, p. 4241; *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]; *Campbell* v. *Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121].)

█ A reading of the record supports the finding of the trial court that the agreement between Coldwell and Bonaguidi for Pepper Tree was orally modified by the parties, with the modification partially acknowledged in the April 11 letter from Coldwell to Bonaguidi, precluding Coldwell from receiving broker commissions on the three Palomar leases.

██ "With the possible exception of an 'exclusive right to sell' listing agreement, a listing contract for the sale of real estate is 'an offer of a unilateral contract, the act requested being the procuring by the broker of a purchaser ready, able and willing to buy upon the terms stated in the offer.' [Citations.]" (*Seck* v. *Foulks* (1972) 25 Cal.App.3d 556, 570 [102 Cal.Rptr. 170].)[3] The leasing agreement between Coldwell and Bonaguidi was similar to such a broker's selling agreement, but modified—in relevant parts—to deny commissions to the broker if a lease were made by the owner (Bonaguidi), and to pay a commission on leases "procured" by Coldwell or anyone but the owner.

█ We agree with the trial court's conclusion that Coldwell did not "procure" the Palomar leases. Simply submitting a one-page brochure to the broker (Grubb & Ellis) of a prospective tenant, and forwarding floor plans to them, does not reasonably constitute the procuring of a tenant "ready, willing and able to lease" the subject property, as required by the agreement involved here, sufficient to give rise to a commission payment. Accordingly, we do not agree with Coldwell "the terms of the Exclusive [agreement] were satisfied" under an agency theory.

---

[3] "Generally, there are three types of brokerage listings. First, the general listing. Such is revocable at the will of the owner in good faith at any time before performance, regardless of the efforts expended by the broker. Such a listing leaves the owner free to list his property with other brokers, to sell it himself, or to withdraw it from the market. Second, the exclusive agency. Terms are inserted in the listing which provide that for a stated period the owner will not deal through other brokers, yet he may sell the property himself without liability. Third, the exclusive right to sell. This type of agency even precludes the owner himself from selling the property during the stated term without paying the brokerage commission.' [Citations.]" (*Seck* v. *Foulks, supra,* 25 Cal.App.3d at p. 570, fn. 12.)

■ We now look at the modification. Proof of the modification must meet the test of Civil Code section 1698[4] (Witkin, Cal. Evidence (2d ed. 1966) Discharge or Modification of Contract, § 743 p. 688).

Before the amendment of Civil Code section 1698 in 1976, California law offered inadequate guidance to parties who found it necessary to make an enforceable oral modification of written contracts (other than for the sale of goods), and the code was subject to a number of judicial interpretations. (See (1977) 8 Pacific L.J. 194.)

As amended, section 1698 now provides a written contract may be modified by an oral agreement to the extent it is "executed by the parties" (Civ. Code, § 1698, subd. (b)), or supported by consideration and the statute of frauds is satisfied (Civ. Code, § 1698, subd. (c)). In addition, the doctrines of rescission, waiver, novation and substitution, estoppel and independent or collateral agreements are other theories under which a written contract can be modified by an oral agreement (Civ. Code, § 1698, subd.(d)).

Thus it appears the two methods applicable to this case by which an enforceable oral modification of the written agreement between Coldwell and Bonaguidi may be found are if (1) the oral agreement is supported by consideration; or (2) the oral agreement is fully executed (Civ. Code, § 1698, subds. (b) and (c)).

## CONSIDERATION

Coldwell argues the oral modification was not supported by adequate consideration; it gained nothing since its services were the choice of Bonaguidi.[5]

---

[4]Civil Code section 1698. "(a) A contract in writing may be modified by a contract in writing.

"(b) A contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties.

"(c) Unless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration. The statute of frauds (Section 1624) is required to be satisfied if the contract as modified is within its provisions.

"(d) Nothing in this section precludes in an appropriate case the application of rules of law concerning estoppel, oral novation and substitution of a new agreement, recission of a written contract by an oral agreement, waiver of a provision of a written contract, or oral independent collateral contracts." (Added by Stats. 1976, ch. 109, § 4, p. 171.)

[5]A review of the record shows the theory of an oral modification was advanced by the court. In clarifying the issue of the communications which occurred after the modification, the court stated "there are no subsequent communications...by the party to be charged [Bonaguidi]." All letters offered by Coldwell were written by Coldwell and sent to Bonaguidi.

In the agreement, as modified by the April 11 conversation and letter, Coldwell agreed to limit its duty and not do further work seeking prospective tenants for the Pepper Tree Office Building. Bonaguidi would give up his rights to use Coldwell's best efforts in procuring leases and the expenditure of resources this would entail.[6]

The forebearance was adequate consideration to support the modification under Civil Code section 1698, subdivision (c), as amended in 1976. It is basic contract law an agreement to forebear to exercise a legal right is sufficient consideration (*Louisville Title Ins. Co.* v. *Surety Title & Guar. Co.* (1976) 60 Cal.App.3d 781, 793 [132 Cal.Rptr. 63]; see also Rest., Contracts, § 90, p. 110; Colanfari and Perillo, Contracts (2d ed.) §§ 4-6, Forebearance as Detriment, pp. 143-145.)

### EXECUTION OF THE ORAL MODIFICATION

■ Civil Code section 1698, subdivision (b), provides "[a] contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties." Proof of every element of the oral agreement, as well as its execution, must be clear and convincing (*Keeble* v. *Brown* (1954) 123 Cal.App.2d 126, 130-131 [266 P.2d 569]; 14 Cal.Jur.3d (1974) § 223, p. 506).

■ How can you execute an agreement not to perform? Answer: By not performing. The conversation between the parties, as evidenced by the letter of April 11, stated Coldwell would forebear from further work on the Palomar leases. No further work was performed.

As provided by Civil Code section 1661, "[a]n executed contract is one, the object of which is fully performed. All others are executory." (See also, 14 Cal.Jur.3d (1974) § 223, p. 504 [what constitutes an executed oral agreement]; (1956) 44 Cal.L.Rev. 158 [application of Civ. Code, § 1698].)

As stated in the April 11 letter and in testimony by R. Kendal Jones of Coldwell, after the oral agreement Coldwell performed as agreed and took a "very passive role" on the Palomar leases. They performed fully. Bonaguidi similarly chose not to use Coldwell's services. On behalf of Pepper Tree, Bonaguidi also performed fully.

---

[6]There was some work to complete as to the License Information Service lease for which Coldwell received a verdict.

We hold the oral modification of the written agreement was fully executed by the parties and satisfied Civil Code section 1698, subdivision (b).

Coldwell argues the oral modification was silent on the issue of payment. The modification was an agreement between the parties that Coldwell would forebear from working further on the Palomar leases, and Bonaguidi forebear from his right to use Coldwell's services on the Palomar leases. The fact the modification was "silent" on the issue of commission is of no importance because the parties modified the agreement, Coldwell had no duties as to the Palomar leases, and accordingly performed no work which would give rise to a commission. Coldwell also argues that an oral modification of a prior written agreement is not enforceable where the change relates to future payments.

Again, this is a mischaracterization of the modification which involved the duties of the parties and not the commissions payable. Cases cited by Coldwell give the law before the 1976 amendment to Civil Code section 1698.

### DISPOSITION

The record substantially supports the court's findings the broker's agreement was orally modified by the parties, with an acknowledgment of the modification found in the April 11 letter, precluding commission payments to Coldwell on the three Palomar leases. The modification was fully executed by the parties and supported by forebearance as adequate consideration.

Attorney fees on appeal are awarded to the respondents and we remand this matter to the superior court to set the amount.

Judgment affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.